## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| | * |
| **JEFFREY VANCE**, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *   Civil Case No.: RWT 11-3210 |
| | * |
| **CHF INTERNATIONAL,** *et al.*, | * |
| | * |
| Defendants. | * |
| | * |
| | *** |

## <u>MEMORANDUM OPINION</u>

On November 10, 2011, Plaintiffs, who are the personal representative of the estate of Stephen D. Vance and his wrongful death beneficiaries, filed a six-count complaint against Defendant CHF International ("CHF") and Defendant Unity Resources Group ("URG") asserting claims for wrongful death; survivorship; loss of consortium; negligent hiring, supervision, training; and intentional infliction of emotional distress based on the murder of Mr. Vance while he was performing aid work in Pakistan.  Doc. No. 1.

On December 21, 2011, CHF moved to dismiss arguing that (1) Defense Base Act ("DBA") insurance provides Plaintiffs an exclusive remedy and (2) Plaintiffs fail to allege an intentional infliction of emotion distress claim.  Doc. No. 6.  On January 9, 2012, Plaintiffs filed their opposition, Doc. No. 18, to which CHF replied on January 26, 2012.  Doc. No. 19.  On February 26, 2012, Plaintiffs filed a motion for leave to file a sur-reply, which CHF opposed on February 14, 2012.  Doc. No. 27.

On February 24, 2012, URG moved to dismiss on the basis that this Court cannot exercise personal jurisdiction over it.  Doc. No. 28.  On March 26, 2012, Plaintiffs filed their opposition, Doc. No. 31, to which URG replied on April 9, 2012.  Doc. No. 32.  A hearing on the

motions was held on April 13, 2012.  For the reasons discussed below, Defendants' motions will be granted, and the Plaintiffs' motion will be denied.

I.     **Background**

CHF is a development organization founded in 1952 that works in conflict-affected areas and developing countries.  Compl. ¶ 11.  CHF relies on private donations and governmental grants to perform its activities.  *Id.* ¶ 12.  Plaintiffs allege that in 2008, one of CHF's projects was to implement a job creation and workforce development program in Pakistan's Federally Administered Tribal Area ("FATA") located in northwest Pakistan.  *Id.* ¶ 13.  "The project was funded, in whole or in part, by the United States Agency for International Development ("USAID") via a Cooperative Agreement."  *Id*.  Plaintiffs contend that "the Cooperative Agreement required that CHF provide security for its employees" and that CHF contracted with URG "in Maryland for URG to consult on security matters to provide security and safety services for CHF personnel" in Pakistan.  *Id.* ¶¶ 14-15.  URG is incorporated in Singapore, and its headquarters are located in Dubai.

The Cooperative Agreement between CHF and USAID established the Livelihood Development program.  The Agreement states that "[p]ursuant to the authority contained in the Foreign Assistance Act of 1961, as amended [USAID] hereby awards to CHF International . . . the sum of $149,998,130 to provide support for the [Program]."  Doc. No. 6, Ex. A at 1.  The Agreement provided for the implementation of the Program in the FATA, Frontier Regions, and NWFP districts.  *Id.* at A-1.  The main components of the Program include "(1) creating jobs, increasing incomes and teaching employable skills, with a focus on unemployed youth; (2) revitalizing community infrastructure and essential services; and supporting established businesses and developing new sustainable business."  Doc. No. 6 at 4.

The Cooperative Agreement required CHF to provide DBA insurance coverage to its employees working on the Program. *See id.* Ex. A at C-2 (incorporating by reference all provisions of 22 C.F.R. 226); 22 C.F.R. 226, App. A ¶ 9 ("Contracts which require performance outside the United States shall contain a provision requiring Worker's Compensation Insurance (42 U.S.C. 1651, et seq.)."). CHF maintains that it "procured [DBA] insurance coverage for Mr. Vance, as exhibited by the fact that Mr. Vance's beneficiaries have been receiving DBA death benefits since January 26, 2009." Doc. No. 6 at 4.

CHF hired Mr. Vance to direct the project of implementing a job creation and workforce development program in FATA. Compl. ¶¶ 16-18. Plaintiffs allege that CHF "knew or should have known" about the dangerous, violent conditions in Northwest Pakistan. *Id.* ¶¶ 18-24. Plaintiffs contend that international organizations warned NGO's, such as CHF, to "implement minimum operating security standards, ("MOSS"), designated to enhance employee security and mitigate risk," which Plaintiffs allege CHF failed to do. *Id.* at ¶ 24-25. Plaintiffs maintain that "CHF's failure to provide adequate security was conducted via decisions coordinated from its Maryland headquarters." *Id.* ¶26.

On November 12, 2008, Mr. Vance and his driver were shot and killed on their way to CHF's office in Peshawar. *Id.* ¶ 29. Plaintiffs maintain that the driver drove through "choke points, areas where a vehicle could be slowed or stopped by the natural terrain or other man-made obstacles." *Id.* ¶ 30. At one choke, "another vehicle struck Mr. Vance's vehicle from behind" and gunmen got out of another vehicle and ambushed Mr. Vance and his driver with assault rifles." *Id.* ¶¶ 31-32. Each man was shot multiple times and killed. *Id.* ¶¶ 33-35. Plaintiffs allege that the vehicle in which Mr. Vance rode was not protected with armor and that

his driver was not properly trained to deal with ambush attacks. *Id.* ¶¶ 27-28.  The Vance family was required to identify the decedent's body before leaving Pakistan. *Id.* ¶ 36.

Mr. Vance's DBA benefits began on November 13, 2008, with the first payment of compensation occurring on January 26, 2009. *See id.* Ex. B (U.S. Department of Labor Notice of Final Payment or Suspension of Compensation Payments ("DOL Notice")).  CHF contends that Plaintiffs conceded that Mr. Vance's death was covered by CHF's DBA insurance and have confirmed in writing that they are in agreement with respect to the benefits owed to Mr. Vance's statutory dependents under the DBA as well as the amount of those benefits.  *Id.* Ex. C. Plaintiffs maintain that the DBA benefits are not their exclusive remedy.

## II.      Standard of Review

### a.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) raises the question of whether a court has the authority to hear and decide a case.  *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005).  A court may grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Id.* (citations omitted).  "In a Rule 12(b)(1) motion, the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003) (quotation omitted).  When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff.  *See Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.3d 765, 768 (4th Cir. 1991).

**b.   Motion to Dismiss for Lack of Personal Jurisdiction**

"When a defendant files a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of proving grounds for jurisdiction by a preponderance of the evidence." *Allcarrier Worldwide Servs., Inc. v. United Network Equipment Dealer Ass'n*, 812 F. Supp. 2d 676, 680 (D. Md. 2011) (citing *Mylan Labs., Inc. v. Akzo*, 2 F.3d 56, 59-60 (4th Cir. 1993)). "This burden requires the plaintiff to produce competent evidence to sustain jurisdiction, including, for example, sworn affidavits." *Id.* (citing *Nichols v. G.D. Searle & Co.*, 783 F. Supp. 233, 235 (D. Md. 1992)). "In determining the existence of jurisdiction, the court should draw all 'reasonable inferences' from the proof offered by the parties in the plaintiff's favor." *Id.* (quoting *Mylan Labs.*, 2 F.3d at 62). The court does not look solely to the evidence produced by the plaintiff, but rather it "must consider 'all relevant pleading allegations in the light most favorable to the plaintiff,' and draw reasonable inferences therefrom." *Id.* (quoting *Mylan Labs.*, 2 F.3d at 62).

**c.   Motion to Dismiss for Failure to State a Claim Upon Which Relief can be Granted**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "shown"—that the pleader is entitled to relief." *Id.* at 1950; *see also Simmons & United Mortg.*

5

& *Loan Invest.*, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (quotation and emphasis omitted).

A court must consider all well-pleaded allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe factual allegations in the light most favorable to the plaintiff.  *See Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), conclusory allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted).  "'Thus, in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6) a court must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level.'"  *Monroe v. City of Charlottesville*, 579 F.3d 380, 386 (4th Cir. 2009) (quoting *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009)).

## III.   Analysis

### a.   The DBA Provides the Exclusive Remedy for Plaintiffs' Common-Law Tort Claims

The DBA provides that

> [t]he liability of an employer, contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this chapter shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents) coming within the purview of this chapter, under the workmen's compensation law of any State, Territory, or other jurisdiction, irrespective of the place where the contract of hire of any such employee may have been made or entered into.

§ 42 U.S.C. § 1651(c).   In addition, the DBA extends coverage of the Longshore and Harbor

Workers' Compensation Act, 42 U.S.C. § 1651(a), to apply to employees of contractors outside

of the United States.   *See Nordan v. Blackwater Sec. Consulting*, 382 F. Supp. 2d 801, 807

(E.D.N.C. 2005).   The Longshore Act "provides for the exclusivity of remedy against a

qualifying employer for injury or death:

> The liability of an employer prescribed in section 4 [33 U.S.C. §
> 904] shall be exclusive and in place of all other liability of such
> employer to the employee, his legal representative, husband or
> wife, parents, dependents, next of kin, and anyone otherwise
> entitled to recover damages from such employer at law or in
> admiralty on account of such injury or death . . ."

*Id.* (quoting 33 U.S.C. § 905(a)).   "As Section 5 of the Longshoremen's and Harbor Workers'

Compensation Act destroys any underlying tort liability of the employer, . . . it necessarily

displaces all derivative common-law causes of action based on the injury or death of a covered

employee caused by employer negligence, including wrongful death and survivorship actions."

*Ross v. Dyncorp*, 362 F. Supp. 2d 344, 352 (D.D.C. 2005) (quotation omitted) ("[I]f it is

established that either § 1651(a)(4) or § 1651(a)(5) of the DBA is applicable in [sic] virtue of the

nature of the Contract, then the remedial provisions of the Longshore Act provide the exclusive

remedies for [decedent]'s death, displacing the plaintiffs' common law negligence-based claims

against [defendant].").[1]

"The DBA establishes a uniform, federal compensation scheme for civilian contractors

and their employees for injuries sustained while providing functions under contracts with the

United States outside its borders."   *Fisher v. Halliburton*, 667 F.3d 602, 610 (5th Cir. 2012).   The

DBA, like the Longshore Act and other workers' compensation statutes, "represents a

---

[1] "A very narrow exception to the DBA's exclusive liability provision applies where the employer acted with the specific intent to injure the employee."   *Fisher v. Halliburton*, 390 F. Supp. 2d 610, 613 (S.D. Tex. 2005).   Plaintiffs have not alleged facts sufficient for this exception to apply.

compromise between employees and their employers." *Id.* "Employers relinquish their defenses to tort actions in exchange for limited and predictable liability, and employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail." *Id.* (quotations and internal bracketing omitted). "Thus, the DBA, like the [Longshore Act], includes a provision making an employer's liability under the workers' compensation scheme exclusive. If an employee's injury is covered under the DBA, he is generally precluded from pursuing a tort claim against his employer to recover for the same injury." *Id.*

CHF argues that this Court lacks subject matter jurisdiction because the DBA provides the exclusive remedy for descendant's death under one of two provisions: (1) Mr. Vance's Contract was performed under the Foreign Assistance Act ("FAA") pursuant to § 1651(a)(5) or (2) Mr. Vance's employment included "public work" as defined by § 1651(a)(4). Plaintiffs contend that CHF has not demonstrated that the DBA applies to their claims.

### i. The DBA Applies Pursuant to 1651(a)(5) Because Funding was Provided Under the FAA and CHF Maintained the Required DBA Insurance

The DBA applies to the injury of death of an employee engaged in employment:

> under a contract approved and financed by the United States or any executive department . . . where such contract is to be performed outside the continental United States, under the [Foreign Assistance Act], as amended . . . and every such contract shall contain provisions requiring that the contractor . . . (A) shall, before commencing performance of such contract, provide for securing to or on behalf of employees engaged in work under such contract the payment of compensation and other benefits under the provisions of this chapter . . .

§ 42 U.S.C. § 1651(a)(5).[2]  The DBA's exclusive remedy provisions apply under this subsection if: (1) the relevant injury or death is suffered by an employee working under a contract performed outside the continental United States; (2) the contract is under the FAA; and (3) the contract contains provisions requiring the contractor to secure benefits under the DBA.

The parties agree that Mr. Vance was an employee working under a contract performed outside of the United States and that the contract contained provisions requiring the contractor to secure benefits under the DBA.  The parties dispute whether the contract was performed under the FAA.

CHF maintains that the only inquiry that the Court need to make is whether the contract with USAID was financed in the manner required by the DBA.  Doc. No. 19 at 5.  Plaintiffs argue that the statutory subsection contains two operative phrases that the Court must consider. Plaintiffs contend that "[a]lthough the statute itself does not define what it means for a contract to be 'performed under' the FAA, Congress chose to use the express term 'financed by' in the first phrase of § 1651(a)(5), while using the entirely distinct terms 'performed' and 'under' as the condition determining when the DBA applies to contracts executed under the FAA."  Doc. No. 18 at 8.  Plaintiffs' hyper-technical reading of the statute is not persuasive.

Courts have held that where, as here, plaintiffs concede that the contract was to be performed outside the continental United States, and that the contract contained the workers'-compensation-insurance related provisions required by § 1651(a)(5), "the only issue [] before the Court regarding the applicability of § 1651(a)(5) is whether the Contract was 'financed' in the

_____

[2] The parties agree that the Mutual Security Act of 1954 cited in the DBA was repealed and superseded by the Foreign Assistance Act of 1961.  *See Overseas African Const. Corp. v. McMullen*, 500 F.2d 1291, 1295 n.10 (2d Cir. 1974); *Ross v. Dyncorp*, 362 F. Supp. 2d 344, 353 (D.D.C. 2005) ("This subsection covers contracts that are to be performed outside the continental United States that are financed under the Mutual Security Act of 1954, which was repealed and superseded by the Foreign Assistance Act of 1961.").

manner required by the subsection." *Ross*, 362 F. Supp. 2d at 353. The Cooperative Agreement referenced in the Complaint, and attached to CHF's Motion to Dismiss, states that "[p]ursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the [USAID] hereby awards to CHF International" monies to complete CHF's Program. Doc. No. 6, Ex. A at 1. Additionally, Plaintiffs concede that the Agreement "was funded, in whole or in part, by the [USAID]." Compl. ¶ 13.

Plaintiffs' argument that the terms 'performed under' and 'funded by' are not synonymous lacks support in case law and is an incorrect interpretation of the statute. Section 1651(a)(5) has two clauses with which Plaintiffs take issue. First, the contract must be "approved and financed by the United States or executive department, independent establishment, or agency thereof." Here, the contract is financed by USAID. Second, the contract must be "performed under the [FAA]." Here, USAID awarded the sum for the project pursuant to the Foreign Assistance Act. Although Plaintiffs argue that CHF "has not demonstrated the statutory grant of authority for the work to be *performed under* the Cooperative Agreement," Doc. No. 18 at 9, the Cooperative Agreement states that the contract is *based on the authority of* the Foreign Assistance Act, which implicates this statutory provision.[3]

### ii. In the Alternative, the DBA Applies Pursuant to 1651(a)(4) Because CHF's Contract Constituted "Public Works"

The DBA applies to employees:

> under a contract entered into with the United States or any executive department, independent establishment, or agency thereof . . ., or any subcontract, or subordinate contract with

---

[3] During the motions hearing, Plaintiffs' counsel argued that jurisdictional discovery is necessary before this Court acts on the pending motion. This Court disagrees. CHF has provided Plaintiffs with the Cooperative Agreement, DOL Notice, and the Order Approving Stipulation of the Parties. These documents demonstrate that the Project was funded pursuant to the FAA, that Mr. Vance's death was covered by CHF's DBA insurance policy, and that Mr. Vance's beneficiaries received DBA benefits.

> respect to such contract, where such contract is to be performed outside the continental United States . . . for the purpose of engaging in public work . . .

§ 1651(a)(4).   There are again three factors to consider in determining whether the DBA coverage applies: whether (1) the contract is with the United States or an executive department; (2) the contract is to be performed outside the continental United States; and (3) the purpose of the contract is to engage in public work.  As discussed above, the parties agree that Mr. Vance was an employee working under a contract performed outside of the United States and that the contract contained provisions requiring the contractor to secure benefits under the DBA.  The only issue the Court must decide is whether the contract was for the purpose of engaging in public work.

Under the DBA, the term public work:

> means any fixed improvement or any project, whether or not fixed, involving construction, alteration, removal or repair for the public use of the United States or its allies, including but not limited to projects or operations under service contracts and projects in connection with the national defense or with war activities, dredging, harbor improvements, dams, roadways, and housing, as well as preparatory and ancillary work in connection therewith at the site or on the project

42 U.S.C. § 1651(b)(1).

Courts have found that public work generally consists of "work constituting government-related construction projects, work connected with the national defense, or employment under a service contract supporting either activity."  *Univ. of Rochester v. Hartman*, 618 F.2d 170, 176 (2d Cir. 1980) (holding that a professor who suffered a fatal fall collecting soil samples in Antarctica was not engaged in public work within the meaning of the DBA); *Makris v. Spensieri Painting*, 669 F. Supp. 2d 201, 206 (D.P.R. 2009) ("'The sine qua non of the Act's applicability has always been a military or a United States government construction connection.  There is no

reason to suppose that a service contract is exempt from this prerequisite nexus.'") (quoting *Hartman*, 618 F.2d at 173-74).

The Benefits Review Board has held that a "claimant's employment teaching Asian Studies in the Pacific to Navy personnel [on board Navy ships in the Pacific] under a contract is related to national defense and therefore constitutes 'public work' within the meaning of the statute." *Casey v. Chapman College*, 23 BRBS 7, at *3 (1989). Courts generally find that 'public work' "is a very broad term and should be liberally construed in line with the public policy of protection for the employees, a policy embodied in the Longshoremen's and Harbor Workers' Compensation Act . . . which was extended to projects in connection with the war effort by the Defense Bases Act." *Republic Aviation Corp. v. Lowe*, 69 F. Supp. 472, 479 (S.D.N.Y. 1946).

The parties agree that the contract under which Mr. Vance worked had three main components and project areas: "(1) creating jobs, increasing incomes and teaching employable skills, with a focus on unemployed youth; (2) revitalizing community infrastructure and essential services; and (3) supporting established businesses and developing new sustainable business." Doc. No. 6 at 4.

CHF argues that the Cooperative Agreement constituted public work for two reasons: (1) because "the project was part of a joint effort to counter the growing influence of extremist and terrorist groups, it related to the national defense" and (2) "specific activities undertaken pursuant to the contract dealt explicitly with construction and infrastructure improvement initiatives, as well as activities in support thereof." Doc. No. 6 at 15. Plaintiffs argue that Mr. Vance's work was mostly "humanitarian economic development work, which is not remotely within the ambit of § 1651(b)(1)." Doc. No. 18 at 7.

The FATA Livelihood Development Program Description states: "[t]o win the Global War on Terrorism, the United States must help the [Government of Pakistan] recast its relationship with the country's FATA region," and that "[c]ountering extremist influences in FATA will require a robust economic development program implemented with the support and assistance of the U.S. and international community."  Doc. No. 6, Ex. A at 3.  CHF argues that pursuant to the Cooperative Agreement, employees conducted improvements to "rural agriculture infrastructure, afforestation, plantation, and pit-digging."  Doc. No. 6 at 15; Ex. A at 10.  CHF contends that "[d]evelopment in FATA is vital to Pakistan's progress in fighting insurgents, and the Livelihood Development Program was established as part of a joint effort between the United States and Pakistan to provide social and economic stabilization in FATA to counter the growing influence of extremist and terrorist groups."  Doc. No. 6 at 15.

This Court finds that that CHF's program comes under the public works provision of § 1641(a)(4).  The work appears to constitute work performed under a service contract connected with a government-related construction project and work done in connection with the national defense.  The Program indicates that it is being undertaken to counter extremist influences in Pakistan, which is a goal of the United States' war on terror.  The program also includes construction projects such as rebuilding agricultural infrastructure in the FATA.

Therefore, the DBA applies pursuant to § 1651(a)(5) and § 1651(a)(4)  and is Plaintiffs' exclusive remedy.  Therefore, the Court will grant CHF's motion to dismiss for lack of subject matter jurisdiction Counts I-IV and VI of the Complaint.

### b. Plaintiffs' Intentional Infliction of Emotional Distress Claim is Subject to Dismissal

The issue of whether DBA exclusivity bars an intentional tort claim appears to be one of first impression for the Court of Appeals for the Fourth Circuit.  Recently, the Fifth Circuit held

that the DBA bars plaintiffs from bringing claims of intentional torts against employers unless the claim involves "injuries caused by an employer's intentional assault of an employee with the specific desire to injure the employee." *Fisher v. Halliburton*, 667 F.3d 602, 618 (5th Cir. 2012). The court reasoned that the remedy provided by the DBA "'shall be *exclusive and in place of all other civil liability.*'" *Id.* at 619 (quoting 42 U.S.C. § 1651(c)) (emphasis in original). The court interpreted this provision to mean that "the coverage provisions of the [DBA] clearly evidence the intent that the act shall afford the sole remedy for injuries or death suffered by employees in the course of employments which fall within its scope." *Id.* (quotation omitted). The Fifth Circuit concluded that "allowing an injured employee to recover from his employer under this theory of intentional-tort liability would inject into the DBA's workers' compensation scheme an element of uncertainty at odds with the statute's basic purpose: providing prompt relief for employees, and limited and predictable liability for employers." *Id.*

The Court adopts this reasoning of the Fifth Circuit and concludes that Plaintiffs' intentional infliction of emotional distress claim (Count V) will be dismissed for lack of subject matter jurisdiction.

Moreover, Plaintiffs' intentional infliction of emotional distress claim also fails to state a claim upon which relief can be granted. Plaintiffs allege that CHF's "willful failure to provide Mr. Vance with adequate security given its knowledge of horrific acts of violence being perpetrated on Westerns and others by persons sworn to kill such individuals, was extreme, outrageous and beyond all bounds of decency tolerated by a civilized society." Compl. ¶ 56.

In order to succeed on an intentional infliction of emotional distress claim, Plaintiffs must demonstrate (a) intentional or reckless conduct that is (b) outrageous and extreme (c) causally connected to (d) extreme emotional distress. *See Caldor, Inc. v. Bowden*, 330 Md. 632, 641-42

(1993).  Maryland courts "have made it clear that liability for the tort of intentional infliction of emotional distress should be imposed sparingly, and its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Id.* at 642 (quotation omitted).  "In order to satisfy the element of extreme and outrageous conduct, the conduct 'must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 525 (2005) (quoting *Batson v. Shiflett*, 325 Md. 684, 733 (1992)).  The emotional distress "must be so severe that 'no reasonable man could be expected to endure it.'" *Id.* (quoting *Harris*, 281 Md. at 571).  "One must be unable to function; one must be unable to tend to necessary matters." *Id.* (quotation omitted).  Finally, Maryland courts "have said that a complaint alleging intentional infliction of emotional distress must be pleaded with specificity." *Id.* (citing *Foor v. Juvenile Sevs. Admin.*, 78 Md. App. 151, 175 (1989)).

CHF argues that the "Complaint fails to allege a claim upon which relief can be granted because Plaintiffs have failed to plead with specificity the necessary elements of a claim of intentional infliction of emotional distress." Doc. No. 6 at 17.  Additionally, CHF maintains that Plaintiffs also fail to allege that "there was any causal connection between the alleged wrongful conduct and the alleged emotional distress." *Id.*  Plaintiffs contend that the Complaint plainly states the elements of an intentional infliction of emotional distress claim.  Doc. No. 18 at 9-10.

Plaintiffs' intentional infliction of emotional distress claim fails to allege facts sufficient to survive a motion to dismiss.  The only specific allegations of conduct by CHF in the Complaint are that the Defendants' "willful failure to provide Mr. Vance with adequate security . . . was extreme, outrageous, and beyond all bounds of decency tolerated by a civilized society." Compl. ¶ 56.  The only allegations of injury are that "Plaintiffs have suffered and will continue

to suffer, severe emotional distress."  Compl. ¶ 58.  Even when accepting all of Plaintiffs' factual allegations as true, the Complaint merely recites in conclusory form the bare elements of an intentional infliction of emotional distress claim.  Moreover, the alleged failure to provide security is, at best, an averment of negligence, not intentional action, and the tort of negligent infliction of emotional distress is not recognized in Maryland.  *See, e.g.*, *Lapides v. Trabbic*, 134 Md. App. 51, 66 (2000).

Even if the requisite outrageous and extreme intentional action had been alleged, Maryland courts have held that there is a "high burden imposed by the requirement that a plaintiff's emotional distress be severe."  *Manikhi v. Mass Transit Admin*., 360 Md. 333, 368-69 (2000).  Plaintiffs are required to allege "a severely disabling emotional response" that includes "with reasonable certainty the nature, intensity or duration of the alleged emotional injury."  *Id.* at 370.  In *Manikhi*, the Court of Appeals of Maryland found that dismissal of plaintiff's intentional infliction of emotional distress claim was proper where the plaintiff failed to allege "evidentiary particulars" such as "whether the medical treatment that she was forced to seek was of a psychological or physical nature, how long the treatment lasted, whether it was successful or is still continuing, whether it was periodic or intensive, and so forth."  *Id.*  Here, Plaintiffs' intentional infliction of emotional distress claim fails to allege sufficient facts to demonstrate that any emotional distress was severe.

Accordingly, Count V will be dismissed not only for failure to state a claim, but also because it can only be viewed as a negligence claim for which the exclusive remedy for the Plaintiffs is under the DBA.

### c.   This Court May Not Exercise Personal Jurisdiction Over URG

A federal court may exercise personal jurisdiction over a non-resident defendant if (1) the exercise of jurisdiction is authorized by the forum state's long-arm statute,[4] and (2) the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Maryland has construed its long-arm statute to authorize the exercise of personal jurisdiction to the full extent allowable under the due process requirements of the Fourteenth Amendment. *Id.*; *see also Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993).

For a court's exercise of personal jurisdiction to comport with due process requirements, the nonresident defendant must have sufficient "minimum contacts" with the forum, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 236 U.S. 310, 316 (1945).   In evaluating whether sufficient minimum contacts exist, courts consider: (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *Carefirst,* 334 F.3d at 396.

---

[4] Maryland's long-arm statute enumerates six circumstances whereby a court may exercise personal jurisdiction over a defendant.  It states that a court may exercise personal jurisdiction over a person who, directly or by an agent:

> (1) [t]ransacts any business or performs any character of work or service in the State; (2) [c]ontracts to supply goods, food, services, or manufactured products in the State; (3) [c]auses tortious injury in the State by an act or omission in the State; (4) [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State; (5) [h]as an interest in, uses, or possesses real property in the State; or (6) [c]ontracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b).

While the rule in the Fourth Circuit is that the minimum contacts analysis is "not susceptible to mechanical application," "courts have considered various nonexclusive factors in seeking to resolve whether a defendant has engaged in such purposeful availment." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). "In the business context, these factors include, but are not limited to:" (1) "whether the defendant maintains offices or agents in the forum state"; (2) "whether the defendant owns property in the forum state"; (3) "whether the defendant reached into the forum state to solicit or initiate business"; (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state"; (5) "whether the parties contractually agreed that the law of the forum state would govern disputes"; (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship"; (7) "the nature, quality and extent of the parties' communications about the business being transacted"; and (8) "whether the performance of contractual duties was to occur within the forum." *Id.* (citations omitted).

URG argues that "[w]hile the Complaint alleges with some detail the events in Pakistan which constitute a tort claim, the single allegation of any URG connection with this forum is the allegation that 'CHF contracted with URG in Maryland for URG to consult on security matters.'" Doc. No. 28 at 3 (quoting Compl. ¶ 15). URG maintains that the contract with CHF was not executed by it, but by Unity Resources Pakistan, a subsidiary of URG, which operated in Pakistan. Both parties signed the contract in Pakistan. *Id.*; Ex. 1 ¶¶ 4-5, Ex. A at 1. URG attaches a declaration from Syed Mubashar Hasan Shah, the Country Manager of URG Pakistan, in which he claims that (1) he and one other URG employee had operating responsibilities for advising CHF on security in Pakistan; (2) at all times he and the other employee were located in Pakistan; (3) they reported to CHF through Mr. Vance; and (4) they never traveled to Maryland

to meet with CHF.  Ex. 1 ¶¶ 5-6.  URG also submitted a declaration from Iliyas Campbell, the Manager of URG Middle East and North Africa, who was stationed in Dubai and worked in URG's Dubai office.  He states that an amendment to the contract that he executed was performed in Dubai and that he never traveled to Maryland.  Ex. 2 ¶ 2.

Plaintiffs maintain that URG has sufficient contacts with Maryland for the Court to exercise jurisdiction over URG.  Specifically, Plaintiffs maintain that URG "negotiated the contract with a Maryland company, amended the contract in Maryland, conducted its contractual responsibilities on behalf of a Maryland company, was paid from Maryland, and even agreed that the Contract would be governed by Maryland law."  Doc. No. 31 at 2.  Plaintiffs argue that the Contract was amended three times, and each time the CHF employee signing the amendment did so in Maryland.  *Id.* at 2-3.  The Plaintiffs did not submit affidavits in support of their opposition to the motion to dismiss.

Plaintiffs' allegation that this Court may exercise personal jurisdiction over URG on the basis that URG "[t]ransacts any business or performs any character of work or service in the State" is incorrect.  Plaintiffs rely on *Jason Pharms. Inc. v. Jianas Bros. Packaging Co.*, 94 Md. App. 425, 434 (1993) for the proposition that this Court can exercise jurisdiction over URG.  The present case is distinguishable because the defendant in *Jason Pharms*. reached into Maryland in an attempt to initiate a business relationship with a Maryland company.  The Court of Special Appeals of Maryland found that a Maryland court could exercise jurisdiction over a defendant pursuant to § 6-103(b)(1) where the defendant "initiated the negotiations over the sale by calling [plaintiff] in Maryland and expressing its interest in [plaintiff's] machines; engaged in several weeks of negotiations with [plaintiff], which was at all pertinent times located in Maryland; and

entered into a [] contract . . . with [plaintiff] in Maryland; and sent a down payment of $35,000 into Maryland." *Id.* 433-34.

Here, Plaintiffs fail to demonstrate that URG contacted CHF in Maryland to enter into a business relationship. Additionally, URG's declarations and the contract it attaches demonstrate that the contract between URG Pakistan and CHF was not executed in Maryland. *See* Compl. ¶¶ 14-15. Plaintiffs have failed to offer any evidence that would support any basis for this Court to exercise jurisdiction over URG.

Even assuming Plaintiffs' allegations are true regarding the formation of the contract, the Court still finds that it cannot exercise personal jurisdiction of URG. Plaintiffs maintain that URG engaged in negotiations with a Maryland company, received payment from Maryland, and agreed that Maryland law governs the contract and that any disputes arising under the Contract would be settled by the rules and procedures of the American Arbitration Association. These facts alone are insufficient to allow this Court to exercise jurisdiction. URG (1) does not maintain offices of agents in Maryland, (2) does not own property in the state, (3) did not make in-person contact with a resident in the forum to conduct business, and (4) performed the contract in Pakistan. Therefore, the Court will grant URG's motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(2).

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss will be granted and Plaintiffs' motion will be denied. A separate order follows.


June 19, 2012                                         /s/
Date                                        Roger W. Titus
                                            United States District Judge